[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-14498
_____

D.C. Docket No. 2:08-cv-14402-JEM


PAUL H. EVANS,

Petitioner - Appellee
Cross Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS, ATTORNEY
GENERAL, STATE OF FLORIDA,

Respondents - Appellants
Cross Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(October 23, 2012)

Before CARNES, MARCUS, and PRYOR, Circuit Judges.

CARNES, Circuit Judge:

Confident that he knew what the future would bring, one of Shakespeare's characters boasted that "[t]here are many events in the womb of time which will be delivered." William Shakespeare, Othello, Act I, Scene 3, lines 412–13. On the subject of lower courts predicting that the Supreme Court is going to overrule one of its own decisions, however, Judge Hand cautioned against "embrac[ing] the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant." Spector Motor Serv. v. Walsh, 139 F.2d 809, 823 (2d Cir. 1943) (Hand, J., dissenting). The Supreme Court has made Hand's warning a clear command by repeatedly instructing lower courts that when one of its earlier decisions with direct application to a case appears to rest on reasons rejected in a more recent line of decisions, we must follow the directly applicable decision and leave to the high Court the prerogative of overruling its own decisions. As will become apparent, those instructions are dispositive of the State's appeal from the grant of habeas corpus relief in this case.

I.

This is a murder for hire case in which Paul Evans contracted with Paul Pfeiffer's wife to kill her husband in return for a camcorder, a stereo, and some of the insurance money. Evans v. State, 808 So. 2d 92, 95–98 (Fla. 2001). Evans performed his part of the contract by murdering Pfeiffer with three shots from a

.38 caliber pistol—one bullet to his spine and two bullets to his head.  Id. at 97.

Evans was indicted and convicted on one count of first-degree murder.  As is the practice in Florida, the indictment did not charge a sentencing stage aggravating circumstance.  There was, however, no evidence that Evans had any motive for murdering the victim except for pecuniary gain in the form of the compensation that the victim's wife had agreed to give him in return for killing her husband.  See id. at 95–98.   And the fact that a murder was committed for pecuniary gain is a statutory aggravating circumstance that makes the defendant eligible for a death sentence in Florida.  See Fla. Stat. § 921.141(5)(f) (1990).

After the jury convicted Evans of first-degree murder, as charged, the trial court conducted a separate sentence proceeding in front of the jury.  During that proceeding the jury heard evidence of mitigating circumstances.  The court instructed the jury that it was to render "an advisory sentence based upon [its] determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist."  Although Florida law provided a total of eleven aggravating circumstances at the time Evans murdered Pfeiffer, see id. § 921.141(5)(a)–(k), the court decided that

3

the evidence would support finding only two of them.[1]  The court instructed the

jury that the only aggravating circumstances it could consider were whether Evans

had committed the murder for pecuniary gain, id. § 921.141(5)(f), and whether he

had committed the murder "in a cold and calculated and premeditated manner

without any pretense of moral or legal justification," id. § 921.141(5)(i).  The

court also instructed the jury that:

> If you find the aggravating circumstances do not justify the death penalty, your advisory sentence should be one of life imprisonment without possibility of parole for twenty-five years.
>
> Should you find sufficient aggravating circumstances do exist, it will then be your duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances.
>
> . . . .
>
> Each aggravating circumstance must be established beyond a reasonable doubt before it may be considered by you in arriving at your decision.  If one or more aggravating circumstances are established, you should consider all the evidence tending to establish one or more mitigating circumstances and give that evidence such

---

[1] Florida law currently provides a total of sixteen aggravating circumstances.  See Fla. Stat. § 921.141(5)(a)–(p) (2010).  Under Florida law a criminal statute applies as of the date the offense was committed, see Bernard v. State, 571 So. 2d 560, 561 (5th DCA 1990), so in this opinion, we cite to the Florida death penalty statute that was in effect at the time Evans committed the murder on March 24, 1991, see Fla. Stat. § 921.141 (1990), even though the statute has since been amended in some aspects.  (Because the post-1991 amendments do not affect any of the challenged provisions in this case, it does not matter which version of the statute applies.)

4

weight as you feel it should receive in reaching your conclusion as to the sentence that should be imposed.

(Emphasis added.)  About mitigating circumstances, the court instructed the jury: "Among the mitigating circumstances you may consider, if established by the evidence, are age of the Defendant at the time of the crime, any other aspect of the Defendant's character, record, or background that would mitigate against the imposition of the death penalty."  The court explained that while aggravating circumstances had to be established beyond a reasonable doubt in order for the jury to consider them, mitigating circumstances did not require the same level of proof.  It told the jury that:  "If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established."

The jury returned a verdict recommending by a vote of nine to three that Evans be sentenced to death.  The practice in Florida is for the advisory verdict not to specify which aggravating circumstances the jury found and this verdict followed that practice.  It did not indicate whether the jury had found the pecuniary gain aggravating circumstance or the cold, calculated and premeditated aggravating circumstance, or both.  We do know, however, that the jury had to have found one or both of those aggravating circumstances or it would not have returned the verdict that it did.  See Francis v. Franklin, 471 U.S. 307, 324 n.9,

5

105 S.Ct. 1965, 1976 n.9 (1985) ("[W]e adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions."); see also United States v. Lopez, 649 F.3d 1222, 1237 (11th Cir. 2011) ("We presume that juries follow the instructions given to them."); United States v. Townsend, 630 F.3d 1003, 1013–14 (11th Cir. 2011) (same).

After the jury recommended a death sentence, the trial court held a Spencer hearing,[2] at which the State presented for the court's consideration letters from the victim's father and mother. The court also heard from Evans' mother and from Evans himself. The court entered an order finding that both of the statutory aggravating circumstances that it had permitted the jury to consider did exist: (1) Evans committed the murder for pecuniary gain, and (2) he committed the murder "in a cold, calculated, and premeditated manner without any pretense of legal or moral justification." Evans, 808 So. 2d at 99. The court found one statutory

---

[2]See Spencer v. State, 615 So. 2d 688, 691 (Fla. 1993) (requiring trial judges, after receiving the jury's advisory verdict, to "hold a hearing to: a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) afford the defendant an opportunity to be heard in person").

mitigating circumstance, which was Evans' age at the time he committed the murder (19), and eleven nonstatutory mitigating circumstances. Id. After determining that the two aggravating circumstances outweighed the mitigating circumstances, the court sentenced Evans to death, as the jury had recommended. Id. at 95. The Florida Supreme Court affirmed Evans' conviction and sentence on direct appeal. Id. The United States Supreme Court denied his petition for a writ of certiorari. Evans v. Florida, 537 U.S. 951, 123 S.Ct. 416 (2002).

Seeking postconviction relief in state court, Evans filed a motion under Florida Rule of Criminal Procedure 3.851, asserting six claims for relief, including for the first time a claim that Florida's capital sentencing statute, Fla. Stat. § 921.141, violates the Sixth Amendment, as interpreted in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000).[3] The state collateral court granted an evidentiary hearing on three of

---

[3]Those six claims were (1) ineffective assistance of counsel during the guilt stage (based on six sub-claims) and the State's withholding exculpatory and impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963); (2) ineffective assistance of counsel during the sentence stage (based on two sub-claims); (3) ineffective assistance for failing to object to several jurors and failing to object to a limitation on backstriking; (4) cumulative error; (5) denial of due process by rules prohibiting juror interviews to uncover constitutional error; and (6) that the sentence violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000). Evans v. State, 995 So. 2d 933, 939–40 (Fla. 2008).

his other claims and heard testimony from Evans' trial counsel, alibi witnesses,

mental health experts, and family members.  The court denied Evans' Rule 3.851

motion and his motion for a rehearing.  The Florida Supreme Court affirmed the

On the sixth claim, Evans argued to the state collateral court that the capital sentencing procedures in Fla. Stat. § 921.141 violated his Sixth Amendment right under Ring to have a unanimous jury determine his guilt on all elements of capital first degree murder.  He made the same argument based on Apprendi, but the state collateral court found that he had already raised that claim on direct appeal and that it was "both without merit and procedurally barred."  Doc. 12-35 at 70.  In Evans' federal habeas petition, he did not pursue that "unanimity" claim.  Instead, he asserted that Florida's death penalty procedures violated Ring because "they do not allow the jury to reach a verdict with respect to an aggravating fact that is an element of the aggravated crime punishable by death."  Doc. 1 at 176 (quotation marks and alteration omitted).  Evans pointed out that "Florida law only requires the judge to consider the recommendation of a majority of the jury."  Id. (quotation marks omitted).  Evans also argued that his sentence was unconstitutional because "the aggravating circumstances were not alleged in the indictment."  Id. at 177.  In its order on the State's motion to alter or amend the judgment granting habeas relief, the district court distinguished Evans' Ring claim from the unanimity claim he had made on direct appeal and to the state collateral court, explaining that those were "two separate and distinct claims" and that the Ring decision "does not decide this issue or even address the need for unanimity."  Doc. 27 at 16.

The six ineffective assistance at the guilt phase subclaims were: (1) failing to object to an individual juror's participation in trial; (2) failing to timely request a hearing under Richardson v. State, 246 So. 2d 771 (Fla. 1971); (3) failing to object to inflammatory and prejudicial comments elicited by the State; (4) failing to object to improper bolstering of witness credibility; (5) failing to object during the State's closing argument regarding mutually exclusive factual theories of prosecution; and (6) failing to present evidence.  Id. at 939 n.8.  The two ineffective assistance at the sentence stage subclaims were: (1) failing to present mitigation; and (2) failing to object to serious misstatements of the law, including that the jury's role was merely advisory and that Evans had the burden of proof to establish that mitigation outweighed aggravation.  Id. at 939 n.9.

8

denial of Rule 3.851 relief and denied Evans' petition to it for a writ of habeas corpus. Evans v. State, 995 So. 2d 933, 954 (Fla. 2008). It also denied his motion for rehearing.

Evans then filed a 176-page petition for a writ of habeas corpus in federal district court, raising 17 claims for relief. The district court denied habeas relief on 16 of Evans' claims but granted him relief from his death sentence on his seventeenth claim, ruling that Florida's capital sentencing statute violates the Sixth Amendment as interpreted in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428 (2002). The State filed a motion to alter or amend, contending that the district court had erred in that part of its ruling; the district court denied that motion.

Evans also filed a motion to alter or amend, which the district court denied, reasserting its rejection of Evans' claims that (1) his Sixth Amendment right to a public trial was violated; (2) his counsel was ineffective during the guilt stage of the trial; and (3) his Eighth and Fourteenth Amendment rights were violated because the trial court did not require the State to specify its theory of the prosecution.

The district court granted Evans a certificate of appealability on two of his claims: (1) that his rights were violated by closure of the courtroom during voir dire; and (2) that his counsel rendered ineffective assistance by failing to call

9

Mindy McCormick to testify.  The State appealed the district court's grant of habeas relief on Evans' Ring claim, and Evans cross-appealed the district court's denial of relief on the two claims on which the district court had granted a certificate of appealability.

Evans asked this Court to expand the certificate of appealability, and we did but only insofar as it concerned his claim that counsel was ineffective at the guilt phase for failing to call alibi and impeachment witnesses.  We will take up the issue in the State's appeal before moving to Evans' cross-appeal.

## II.

The State appeals the part of the district court's judgment that granted Evans habeas relief from his death sentence on the theory that application of the jury sentencing provisions of the Florida statute violated his Sixth Amendment rights, as interpreted in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428 (2002).  Florida's procedures comply with the Sixth Amendment and Ring, according to the State, because a judge may sentence a defendant to death only after considering and giving "great weight" to a jury's advisory sentence.  See, e.g., Ault v. State, 53 So. 3d 175, 200 (Fla. 2010) ("[T]he court must independently consider the aggravating and mitigating circumstances and reach its decision on the appropriate penalty, giving great weight to the jury's advisory sentence." (citing Tedder v. State, 322 So.

10

2d 908 (Fla. 1975))).  And a jury cannot advise in favor of death unless it finds beyond a reasonable doubt at least one statutory aggravating circumstance.  See, e.g., Ault, 53 So. 3d at 205.  Evans, on the other hand, contends that the district court got it right because under Florida's sentencing procedure a judge and not the jury actually finds the facts necessary to establish an aggravating circumstance, which makes the defendant death eligible.

Three lines of Supreme Court decisions are relevant to our decision in this case.  The first line of decisions specifically upholds the advisory jury verdict and judicial sentencing component of Florida's capital punishment statute.  The second line involves the unconstitutionality of Arizona's former capital sentencing procedures under which a judge, without any input from the jury, found the facts necessary to authorize a death sentence.  The third and decisive line of decisions instructs us to follow directly applicable Supreme Court decisions until that Court itself explicitly overrules them.

A.

We begin with the line of decisions upholding Florida's allocation of sentencing functions between the jury and judge in capital cases.  Under Florida law, after a jury convicts a defendant of a capital felony, the trial court must conduct a separate sentence proceeding before the jury.  Fla. Stat. § 921.141(1)

11

(1990).   The jury must then "render an advisory sentence to the court, based upon

[the jury's determination of] the following matters:  (a) [w]hether sufficient

[statutory] aggravating circumstances exist . . . ; (b) [w]hether sufficient mitigating

circumstances exist which outweigh the aggravating circumstances . . . ; and (c)

[b]ased on these considerations, whether the defendant should be sentenced to life

imprisonment or death."  Id. § 921.141(2)(a)–(c).  After the jury renders its

advisory sentence:

> [T]he court, after weighing the aggravating and mitigating
> circumstances, shall enter a sentence of life imprisonment or death,
> but if the court imposes a sentence of death, it shall set forth in
> writing its findings upon which the sentence of death is based as to
> the facts:
>
>> (a) That sufficient [statutory] aggravating circumstances
>> exist . . . , and
>
>> (b) That there are insufficient mitigating circumstances
>> to outweigh the aggravating circumstances.

Id. § 921.141(3)(a)–(b).  The court's findings must specify the statutory

aggravating and any mitigating circumstances that do exist.  See, e.g., Oyola v.

State,  — So. 3d — , No. SC 10-2285, 2012 WL 4125816, at *12  (Fla. Sept. 20,

2012) ("[A] sentencing order must expressly consider each proposed mitigating

circumstance, determine if the circumstance exists, and, if the circumstance does

exist, what weight to allocate it.  For [the Florida Supreme] Court to sustain a trial

12

court's final decision in its sentencing order, competent, substantial evidence of record must support the trial court's weighing process.  Moreover, the trial court's sentencing order must reflect 'reasoned judgment' by the trial court as it weighed the aggravating and mitigating circumstances.") (citations omitted).  In making the sentence determination, the trial court must give "great weight" to the jury's advisory sentence.  Tedder v. State, 322 So. 2d 908, 910 (Fla. 1975); see also Ross v. State, 386 So. 2d 1191, 1197 (Fla. 1980); LeDuc v. State, 365 So. 2d 149, 151 (Fla. 1978).

In Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960 (1976), the Supreme Court upheld Florida's judge-based death sentencing procedure under the Eighth Amendment.  In reaching that conclusion, the Court stated:

> This Court has pointed out that jury sentencing in a capital case can perform an important societal function, but it has never suggested that jury sentencing is constitutionally required.  And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.
>
> The Florida capital-sentencing procedures thus seek to assure that the death penalty will not be imposed in an arbitrary or capricious manner.  Moreover, to the extent that any risk to the contrary exists, it is minimized by Florida's appellate review system, under which the evidence of the aggravating and mitigating circumstances is reviewed and reweighed by the Supreme Court of Florida to determine

13

independently whether the imposition of the ultimate penalty is
warranted.  The Supreme Court of Florida . . . has not hesitated to
vacate a death sentence when it has determined that the sentence
should not have been imposed. . . .

Under Florida's capital-sentencing procedures, in sum, trial
judges are given specific and detailed guidance to assist them in
deciding whether to impose a death penalty or imprisonment for life.
Moreover, their decisions are reviewed to ensure that they are
consistent with other sentences imposed in similar circumstances.

Id. at 252–53, 96 S.Ct. at 2666–67 (plurality opinion) (citations and quotation

marks omitted).

The Supreme Court returned to Florida's death sentencing procedures in

Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154 (1984).  In that case the

defendant contended the trial judge had violated the Sixth Amendment by

sentencing him to death even though the jury had recommended a life sentence.  Id.

at 457, 104 S.Ct. at 3160.  Rejecting that contention, the Court reasoned that "[t]he

fact that a capital sentencing is like a trial in the respects significant to the Double

Jeopardy Clause . . . does not mean that it is like a trial in respects significant to the

Sixth Amendment's guarantee of a jury trial."  Id. at 459, 104 S.Ct. at 3161.  The

Court continued:

There is no . . . danger [of an erroneously imposed death penalty]
involved in denying a defendant a jury trial on the sentencing issue of
life or death.  The sentencer, whether judge or jury, has a
constitutional obligation to evaluate the unique circumstances of the

14

individual defendant and the sentencer's decision for life is final.
More important, despite its unique aspects, a capital sentencing
proceeding involves the same fundamental issue involved in any
other sentencing proceeding—a determination of the appropriate
punishment to be imposed on an individual.  The Sixth Amendment
never has been thought to guarantee a right to a jury determination of
that issue.

Id. (citations omitted).

The Court reevaluated Florida's judge-based death sentencing procedure five

years later in Hildwin v. Florida, 490 U.S. 638, 109 S.Ct. 2055 (1989) (per curiam),

and once again held that those procedures comply with the Sixth Amendment.  The

defendant in Hildwin contended that Florida's procedures violated the Sixth

Amendment because they "permit[] the imposition of death without a specific

finding by the jury that sufficient aggravating circumstances exist to qualify the

defendant for capital punishment."  Id. at 639, 109 S.Ct. at 2056.  The Court

disagreed, holding that "the Sixth Amendment does not require that the specific

findings authorizing the imposition of the sentence of death be made by the jury."

Id. at 640–41, 109 S.Ct. at 2057.  That decision is directly on point against Evans'

contention and the district court's ruling in this case.

While the Hildwin decision is the Supreme Court's last word in a Florida

capital case on the constitutionality of that state's death sentencing procedures, the

Court did speak favorably again about those procedures in a decision involving

15

Alabama's capital punishment statute.  Harris v. Alabama, 513 U.S. 504, 508–09,

515, 115 S.Ct. 1031, 1034, 1037 (1995).  Alabama's sentencing procedures, like

Florida's, provide for an advisory jury sentencing verdict.  See id. at 508, 115 S.Ct.

at 1034.  A difference is that, unlike Florida, Alabama allows a judge to impose a

death sentence without giving a jury's advisory verdict recommending life "great

weight."  In comparing the two procedures, the Court said:

> In various opinions on the Florida statute we have spoken favorably of the deference that a judge must accord the jury verdict under Florida law. While rejecting an ex post facto challenge in Dobbert v. Florida, 432 U.S. 282, 294, 97 S.Ct. 2290, 2298 (1977), we noted the "crucial protection" provided by the standard of Tedder v. State.  In the same fashion, in dismissing Spaziano's argument that the Tedder standard was wrongly applied by the lower courts in his case, we stated:
>
> "This Court already has recognized the significant safeguard the Tedder standard affords a capital defendant in Florida.  We are satisfied that the Florida Supreme Court takes that standard seriously and has not hesitated to reverse a trial court if it derogates the jury's role."

Id. at 510–11, 115 S.Ct. at 1035 (some citations omitted).  The Court went on in the

Harris case to uphold the Alabama statute anyway, but its opinion makes clear that

Florida's Tedder standard adds a measure of protection to the jury's role in

sentencing.  Just three years ago the Court reiterated that point, stating:  "In

Florida, the sentencing judge makes the determination as to the existence and

weight of aggravating and mitigating circumstances and the punishment, Fla. Stat.

16

§ 921.141(3), but he must give the jury verdict of life or death 'great weight.'"

Porter v. McCollum, 558 U.S. 30, —, 130 S.Ct. 447, 453 (2009).

The Supreme Court's confidence in the Florida Supreme Court's stringent application of the Tedder standard has not been misplaced. The State represents to us that the last time the Florida Supreme Court affirmed a trial judge's decision to sentence to death a defendant for whom the jury had not recommended a death sentence was eighteen years ago. Appellant/Cross-Appellee's Reply Br. at 14 n.4; see Washington v. State, 653 So. 2d 362 (Fla. 1994).[4] Evans does not dispute that

---

[4]In making that statement, the State distinguishes, with some justification, between cases in which the jury did not recommend a death sentence at all (pure override cases) and one multiple-victim case in which the jury recommended a death sentence for some but not all of the murders the defendant had been convicted of committing (a mixed override case). Fourteen years ago the Florida Supreme Court did affirm an override in a mixed override case involving unique circumstances. See Zakrzewski v. State, 717 So. 2d 488 (Fla. 1998). The defendant murdered his wife, his seven-year-old son, and his five-year-old daughter. Id. at 490–91. He hacked the two children to death with a machete. Id. The jury recommended a death sentence for the murder of the wife and son but a life sentence for the murder of the daughter. Id. at 491. The trial judge overrode the life recommendation regarding the murder of the daughter, imposing on the defendant three death sentences instead of only the two that the jury recommended. Id. The Florida Supreme Court found that "we are certain that by murdering his children with a machete, [the defendant] caused his children to suffer an unthinkable horror." Id. at 492. And in affirming the override of the life sentence recommendation for the murder of the little girl, it also concluded that the facts warranting a death sentence for her murder were even more compelling than those supporting the death sentences for the murder of her mother and older brother. Id. at 494. So far as the parties have informed us and we can tell, the Zakrzewski case is the last one in which the Florida Supreme Court affirmed an

17

fact.

## B.

We next turn to the line of decisions assessing the constitutionality of Arizona's former death sentencing procedures. An Arizona statute provided that, after a defendant was convicted of first-degree murder, the trial judge would "conduct a separate sentencing hearing to determine the existence or nonexistence of [statutory] circumstances . . . for the purpose of determining the sentence to be imposed." Ariz. Rev. Stat. Ann. § 13-703(C) (West Supp. 2001). The statute specified that "[t]he hearing shall be conducted <u>before the court alone</u>" and that "[t]he court alone shall make all factual determinations required." Id. (emphasis added). After the sentence hearing, the judge would find the existence or nonexistence of statutory "aggravating circumstances" and any "mitigating circumstances." A death sentence could be imposed only if the judge found at least one statutory aggravating circumstance and found that "there [were] no mitigating circumstances sufficiently substantial to call for leniency." Id. § 13-703(F).

So, the Arizona statute was like Florida's in that no death sentence could be imposed unless the trial judge found that the facts and circumstances established an aggravating circumstance or circumstances justifying the death penalty. The

override of a jury's life sentence recommendation in any capital case.

18

statutes were different, however, because under the Arizona statute the jury played no part at all in sentencing and did not constrain in any way the judge's sentencing authority.

The Supreme Court first considered the constitutionality of Arizona's judge-only death sentencing procedure in Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047 (1990). The defendant contended that Arizona's procedure violated the Sixth Amendment, and he sought a broad ruling that the Constitution requires that a jury, not a judge, make the findings of fact underlying the death sentencing decision. Id. at 647, 110 S.Ct. at 3054. The Supreme Court rejected that contention and upheld Arizona's procedure, noting that in Hildwin it had upheld Florida's similar judge-based death sentencing procedure. Id. at 647–49, 110 S.Ct. at 3054–55. The Court reiterated in Walton that the Sixth Amendment does not require a state to "permit only a jury to determine the existence of . . . circumstances" that authorize a death sentence. Id. at 649, 110 S.Ct. at 3055.

Ten years later the Court issued its decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000),[5] which held that a jury must find beyond a

---

[5]In Apprendi, the defendant had been convicted in state court of, among other things, second-degree possession of a firearm, which carried a statutory maximum penalty of 10 years in prison. 530 U.S. at 469–70, 120 S.Ct. at 2352. The sentencing judge found by a preponderance of the evidence that racial bias had motivated the defendant's crime, which increased the statutory maximum for

reasonable doubt any fact that increases a defendant's statutorily authorized punishment, see id. at 482–84, 120 S.Ct. at 2359. In light of the Apprendi decision, the Court revisited the constitutionality of Arizona's judge-only death sentencing procedure in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428 (2002). The Court decided that the Arizona procedure violated the Sixth Amendment because it authorized a death sentence only if the judge, not the jury, found at least one statutory aggravating circumstance. Id. at 609, 122 S.Ct. at 2443. The Ring opinion explained that Apprendi had held that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." Id. at 602, 122 S.Ct. at 2439. The Court reasoned that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury

the crime to 20 years. Id. at 470–71, 120 S.Ct. at 2352. The judge sentenced the defendant to 12 years in prison, two years above the maximum sentence the defendant could have received without the racial bias enhancement. Id. at 471, 120 S.Ct. at 2352.

The Supreme Court held in Apprendi that the defendant's enhanced sentence violated his Sixth Amendment right to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." Id. at 477, 120 S.Ct. at 2356. The Court explained that the Sixth Amendment does not permit a defendant to be "expose[d] . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." Id. at 483, 120 S.Ct. at 2359.

20

determination of any fact on which the legislature conditions an increase in their maximum punishment." Id. at 589, 122 S.Ct. at 2432. The Ring Court recognized that its decision in Walton and its decision in Apprendi were "irreconcilable," id. at 609, 122 S.Ct. at 2443, and it "overrule[d] Walton to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." Id.

## C.

Because Ring concluded that under the Sixth Amendment "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment," 536 U.S. at 589, 120 S.Ct. at 2432, Evans contends—and the district court concluded—that his death sentence is unconstitutional because the trial judge in his case, not the jury, ultimately found the facts that authorized the death penalty. See Fla. Stat. § 921.141(3)(a) (requiring the trial judge to find that "sufficient [statutory] aggravating circumstances" exist). The State counters that Evans' death sentence does not conflict with the Ring decision because the trial judge sentenced Evans to death only after considering and agreeing with the jury's advisory death sentence, which itself found the existence of an aggravating circumstance or circumstances sufficient to support a death sentence. The jury's

21

verdict necessarily contained such findings because the jury was instructed that it could not recommend a death sentence unless it found beyond a reasonable doubt that one or more aggravating circumstances existed and also found after considering the mitigating circumstances that the aggravating circumstances were sufficient to support a death sentence. See Francis, 471 U.S. at 324 n.9, 105 S.Ct. at 1976 n.9; Lopez, 649 F.3d at 1238; Townsend, 630 F.3d at 1014.

The State is correct that its death sentencing procedures do provide jury input about the existence of aggravating circumstances that was lacking in the Arizona procedures the Court struck down in Ring. It is not just that a Florida jury renders an advisory verdict addressing the existence of aggravating circumstances, see Fla. Stat. § 921.141(2)(a), but also that the sentencing judge must give the jury's sentencing verdict "great weight," see, e.g., Tedder, 322 So. 2d at 910; see also supra pp. 10, 12–13, 16–17 & n.4 (discussing application of Florida's Tedder standard). The Supreme Court has not decided whether the role that a Florida jury plays in the death-eligibility determination is different enough from the absence of any role, which was involved in Ring, for the Florida procedures to be distinguishable.

In its Walton opinion, the Court did make these statements about the Florida and Arizona death sentencing procedures in the course of upholding the Arizona

22

procedures:

> It is true that in Florida the jury recommends a sentence, but it does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances and its recommendation is not binding on the trial judge. A Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona.

497 U.S. at 648, 110 S.Ct. at 3054. Nine years later, however, the Supreme Court recognized that there is a difference in the jury's role in the two sets of procedures, which may be constitutionally significant. See Jones v. United States, 526 U.S. 227, 250–51, 119 S.Ct. 1215, 1227–28 (1999). In Jones, which interpreted the penalty provisions of the federal carjacking statute, 18 U.S.C. § 2119, the Court discussed favorably its Hildwin decision and pointed out that Florida juries do play an important role in the capital sentencing process: "In [Florida], a jury ma[kes] a sentencing recommendation of death, thus necessarily engaging in the factfinding required for imposition of a higher sentence, that is, the determination that at least one aggravating factor had been proved." Jones, 526 U.S. at 250–51, 119 S.Ct. at 1228.

Three years later came the Ring decision, which overruled Walton. In the course of doing that, the Supreme Court had this to say in Ring about the Florida procedures and the Hildwin decision, which had provided some of the support for

23

the reasoning in the <u>Walton</u> case:

> In <u>Walton v. Arizona</u>, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), we upheld Arizona's scheme against a charge that it violated the Sixth Amendment.  The Court had previously denied a Sixth Amendment challenge to Florida's capital sentencing system, in which the jury recommends a sentence but makes no explicit findings on aggravating circumstances; we so ruled, <u>Walton</u> noted, on the ground that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury."  <u>Id.</u>, at 648, 110 S.Ct. 3047 (quoting <u>Hildwin v. Florida</u>, 490 U.S. 638, 640–641, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989) (<u>per curiam</u>)).  <u>Walton</u> found unavailing the attempts by the defendant-petitioner in that case to distinguish Florida's capital sentencing system from Arizona's.  In neither State, according to <u>Walton</u>, were the aggravating factors "elements of the offense"; in both States, they ranked as "sentencing considerations" guiding the choice between life and death.  497 U.S., at 648, 110 S.Ct. 3047 (internal quotation marks omitted).

<u>Ring</u>, 536 U.S. at 598, 122 S.Ct. at 2437.  That passage may be read to imply a retreat from the reasoning behind the <u>Hildwin</u> decision, but nowhere in its <u>Ring</u> opinion did the Court say that it was overruling <u>Hildwin</u>.

And there are indications in <u>Ring</u> that the Court did not mean to overrule even implicitly its <u>Hildwin</u> decision.  As they concern the Sixth Amendment rights recognized in <u>Apprendi</u>, the Court in <u>Ring</u> divided into three categories the 38 states with capital sentencing procedures at that time.  One category consisted of the 29 states which "generally commit sentencing decisions to juries," <u>Ring</u>, 536 U.S. at 608 n.6, 122 S.Ct. at 2442 n.6, and for that reason have no <u>Apprendi</u>

24

problem.  The second category consisted of the five States (Arizona and four others) that "commit both capital sentencing factfinding and the ultimate sentencing decision entirely to judges," id., and for that reason run afoul of the Apprendi decision.  The Court's third category consisted of four states, including Florida, that had "hybrid systems, in which the jury renders an advisory verdict but the judge makes the ultimate sentencing determinations."  Id.

By placing Florida's sentencing procedures in a "hybrid" category separate from the jury-only category of sentencing procedures that are clearly permissible, and separate from the judge-only category of sentencing procedures that are impermissible under Ring, the Court indicated that its decision in the Ring case might not be inconsistent with its earlier Hildwin decision; it indicated that the question of whether Hildwin should be overruled was left for another day.  Otherwise, there was no point in separating out, as the Court did, the hybrid system.  If the Court had intended to rule in Ring that jury-only sentencing was required in capital cases, there would be only two categories that mattered:  those in which the jury sentenced and those in which the judge did; hybrid systems would not be a separate category.[6]  See Brice v. State,  815 A.2d 314, 318–19 (Del. 2003)

---

[6]The closing paragraph of the Ring opinion states:  "Accordingly, we overrule Walton to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death

25

("The United States Supreme Court designated Delaware's capital sentencing scheme as a "hybrid system," Ring, 536 U.S. at 608 n.6, 122 S.Ct. at 2442 n.6, and thus distinguished our system from Arizona's."). The most that can be said for Evans' position is that while Ring did not explicitly overrule Hildwin, its reasoning arguably conflicts with the Hildwin decision, and it arguably was implicitly overruled. That is not enough for Evans to prevail in the district court or in this Court.

## D.

Having set out the line of decisions upholding the constitutionality of Florida's advisory jury verdict system, and the line of decisions casting doubt on the constitutionality of that system, we turn now to the third and decisive line of decisions in these circumstances.

The Supreme Court has not always been consistent in its decisions or in its

penalty." Id. at 609, 122 S.Ct. at 2443 (emphasis added). But the important qualifier "sitting without a jury" is not defined outside the context of the case before the Court, which was one in which the jury had no role at all, not even an advisory one, in sentencing. As the opening paragraph of the Ring opinion states: "In Arizona, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty." Id. at 588, 122 S.Ct. at 2432 (emphasis added); see also Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.").

26

instructions to lower courts.  There are, however, some things the Court has been perfectly consistent about, and one of them is that  "it is [that] Court's prerogative alone to overrule one of its precedents."  United States v. Hatter, 532 U.S. 557, 567, 121 S.Ct. 1782, 1790 (2001) (quotation marks omitted).   The Supreme Court has told us many times "that, 'if a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court, the prerogative of overruling its own decisions.'" Jefferson Cnty. v. Acker, 210 F.3d 1317, 1320 (11th Cir. 2000) (alteration omitted) (quoting Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22 (1989)).  Even if a Supreme Court decision looks dead to us, "the Supreme Court has insisted on reserving to itself the task of burying its own decisions."  Id. at 1320.  We must not, to borrow Judge Hand's felicitous words, "embrace the exhilarating opportunity of anticipating" the overruling of a Supreme Court decision.  Walsh, 139 F.2d at 823 (Hand, J., dissenting).

The high Court could not have been clearer about this than it has been.  The Court has told us, over and over again, to follow any of its decisions that directly applies in a case, even if the reasoning of that decision appears to have been rejected in later decisions and leave to that Court "the prerogative of overruling its

27

own decisions." Tenet v. Doe, 544 U.S. 1, 10–11, 125 S.Ct. 1230, 1237 (2005) (quotation marks omitted); accord Hatter, 532 U.S. at 567, 121 S.Ct. at 1790 (overruling one of its earlier decisions but noting with approval that the court of appeals had not done so because, while doubt had been cast on that earlier decision the Supreme Court had not expressly overruled it); Hohn v. United States, 524 U.S. 236, 252–53, 118 S.Ct. 1969, 1978 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continued vitality."); State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 284 (1997) ("Despite what Chief Judge Posner aptly described as Albrecht's infirmities, and its increasingly wobbly, moth-eaten foundations, there remains the question whether Albrecht deserves continuing respect under the doctrine of stare decisis. The Court of Appeals was correct in applying that principle despite disagreement with Albrecht, for it is this Court's prerogative alone to overrule one of its precedents." (alteration and citation omitted)).

A good example of how serious the Supreme Court is about its supreme prerogative rule is Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997 (1997). In that case the lower courts had refused to vacate an injunction that was based on the Supreme Court's earlier decision in Aguilar v. Felton, 473 U.S. 402, 105 S.Ct.

28

3232 (1985), even though Aguilar simply could "not be squared with" some of the Court's intervening decisions, which had brought about "a significant change in" the applicable constitutional law. Agostini, 521 U.S. at 208–09, 235–36, 117 S.Ct. at 2003, 2016. In Agostini the Court pronounced that its Aguilar decision was overruled in relevant part, and instructed the lower courts in the case before it to vacate the order that had been based on the Aguilar decision. Id. at 239–40, 117 S.Ct. at 2018–19. The important part of the Agostini decision for present purposes is not that the Supreme Court explicitly overruled Aguilar but that the Court expressly stated that the lower courts had been correct to follow Aguilar, even if it had been implicitly overruled by intervening decisions, and to leave the supreme prerogative of overruling that decision to the one and only Court with the authority to do so. This is what the Supreme Court said about that:

> We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.

Id. at 237, 117 S.Ct. at 2017 (alteration and quotation marks omitted). And that is true even where the earlier Supreme Court decision that directly applies "cannot be squared with" the Court's later jurisprudence in the area that has "significantly

29

change[d]" the law.  Id. at 521 U.S. at 208–09, 235–36,  117 S.Ct. at 2003, 2016.  It

is true even if the earlier decision has "infirmities" and "increasingly wobbly,

moth-eaten foundations."  Khan, 522 U.S. at 20, 118 S.Ct. at 284.

Like the lower courts in Agostini and in Khan, we have always been careful

to obey the supreme prerogative rule and not usurp the Supreme Court's authority

to decide whether its decisions should be considered overruled.  See United States

v. Greer, 440 F.3d 1267, 1275–76 (11th Cir. 2006) ("The problem with lower

courts basing decisions on predictions that the Supreme Court will overturn one of

its own decisions is that the Supreme Court has repeatedly told us not to do it.  We

take that admonition seriously.") (citations omitted); Jefferson Cnty., 210 F.3d at

1320; Brisentine v. Stone & Webster Eng'g Corp., 117 F.3d 519, 525 (11th Cir.

1997) ("It may be that the Supreme Court has cut Alexander [v. Gardner-Denver

Co., 415 U.S. 36, 94 S.Ct. 1011 (1974),] back so far that it will not survive.

Perhaps, but we are not convinced we are authorized to sing the dirge of

Alexander.  We will leave that to the Supreme Court . . . ."); Eng'g Contractors

Ass'n of S. Fla. Inc. v. Metro. Dade Cnty., 122 F.3d 895, 908 (11th Cir. 1997)

("[W]e are not at liberty to disregard binding case law that is so closely on point

and has been only weakened, rather than directly overruled, by the Supreme

Court.").

30

The problem with Evans' argument that <u>Ring</u>, which held that Arizona's judge-only capital sentencing procedure violated the Sixth Amendment, controls this case is the <u>Hildwin</u> decision in which the Supreme Court rejected that same contention. See <u>Hildwin</u>, 490 U.S. at 640–41, 109 S.Ct. at 2057 (considering the procedures prescribed by Fla. Stat. § 921.141 (Supp. 1988) and holding that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury."). <u>Hildwin</u> is directly on point, and it is binding on us, unless and until the Supreme Court explicitly overrules it. Although the Court in <u>Ring</u> overruled <u>Walton</u>, it did not overrule <u>Hildwin</u>.[7]

---

[7]Members of the Florida Supreme Court have recognized that <u>Ring</u> did not overrule <u>Hildwin</u>. See <u>Bottoson v. Moore</u>, 833 So. 2d 693, 704 n.16 (Fla. 2002) (Anstead, J., concurring) ("[T]he Court [in <u>Ring</u>] overruled <u>Walton</u>, but did not specifically recede from or overrule <u>Hildwin</u> or any of the Court's previous opinions approving of Florida's capital sentencing system."); <u>King v. Moore</u>, 831 So. 2d 143, 155 (Fla. 2002) (Pariente, J., concurring) ("[T]he Supreme Court [in <u>Ring</u>] did not directly address <u>Spaziano</u> and <u>Hildwin</u> and thus, of course, this Court is bound by that precedent to the extent those cases govern the issues presented to us."); <u>Bottoson v. Moore</u>, 824 So. 2d 115, 124 (Fla. 2002) (Wells, J., dissenting) ("The Supreme Court in <u>Ring</u> overruled neither <u>Hildwin</u> nor multiple decisions in which the Supreme Court rejected the very same constitutional challenges to Florida's capital sentencing statute . . . ."); <u>King v. Moore</u>, 824 So. 2d 127, 130 (Fla. 2002) (Wells, J., dissenting) ("The Supreme Court in <u>Ring</u> overruled neither <u>Hildwin</u> nor multiple decisions in which the Supreme Court rejected the very same constitutional challenges to Florida's capital sentencing statute made now by King.").

31

It is true that a principled argument can be made that the Supreme Court's statement in Hildwin that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury," 490 U.S. at 640–41, 109 S.Ct. at 2057, conflicts with the Court's reasoning in Ring that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment," Ring, 536 U.S. at 589, 120 S.Ct. at 2432.[8]  The most that can be said, however, is that this is a situation where "a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions." Rodriguez de Quijas, 490 U.S. at 484, 109 S.Ct. at 1921–22.  And, to reiterate it one last time, the Supreme Court has told us exactly what we are to do in this situation:  we must follow the decision that directly controls, unless and until the Supreme Court makes it non-controlling by overruling it.  Id., 109 S.Ct. at 1921–22.  We understand that instruction, we have

---

[8]A principled argument can also be made that the result in Hildwin is not inconsistent with the result in Ring.  And that is especially true in cases like this one where no rational jury could have found the defendant guilty beyond a reasonable doubt of the murder with which he was charged without implicitly finding that at least one of the statutory aggravating circumstances existed.  There was no evidence presented, and there could have been no rational inference from any of the evidence that was presented, that Evans committed the murder but did not do it for pecuniary gain.

32

always taken it seriously, and we follow it here.  The district court's judgment is due to be reversed insofar as it granted federal habeas relief to Evans on <u>Ring</u> grounds.[9]

### III.

In his cross-appeal, Evans contends that his Sixth Amendment right to a public trial was violated when the court partially closed the voir dire proceedings because of the limited seating that was available in a small hearing room.  That room was used for individual voir dire of those jurors who had given answers indicating that more specific questioning of them in front of the other jurors might lead to a mistrial, like the one that had occurred when the case was last tried.[10]  The

---

[9]Our <u>de novo</u> decision on the merits of the <u>Hildwin</u>/<u>Ring</u> issue makes it unnecessary for us to decide a number of other issues relating to this claim, including: 1) whether the claim is procedurally barred because Evans did not raise it in the state trial court and on direct appeal;  2) whether the Florida Supreme Court's rejection of the claim in the state collateral proceeding is subject to deference under 28 U.S.C. § 2254(d)(1);  3) whether any <u>Ring</u> error in this case would have been harmless in light of the evidence establishing that if Evans committed the murder he must have done it for pecuniary gain; and 4) whether any of the four previously listed issues have been waived by the State.

[10]There had been two mistrials in this case before the third trial, which is the one involved in these proceedings.  "The first trial ended in a mistrial when the jury could not agree upon a verdict.  Evans' second trial ended in a mistrial due to prejudicial information regarding the first trial disseminated by a juror during voir dire questioning."  <u>Evans</u>, 808 So. 2d at 105 n.9.

issue was raised and rejected on appeal to the Florida Supreme Court. Evans v. State, 808 So. 2d 92, 105 (Fla. 2001). The district court carefully considered Evans' arguments and rejected them, concluding that the decision of the Florida Supreme Court on this issue was not contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court. See 28 U.S.C. § 2254(d)(1); Doc. 21 at 61–69.

We agree with the district court's reasoning and resolution of this issue but add three points about the nature of the deference due the Florida Supreme Court's decision under § 2254(d). First, Evans' best arguments on this issue rely on Presley v. Georgia, 558 U.S. 209, 130 S.Ct. 721 (2010), but that Supreme Court decision was issued more than nine years after the Florida Supreme Court decided this issue in this case. It is hornbook AEDPA law that the only Supreme Court decisions against which a state court decision is to be measured are those on the books at the time the state court decision was issued. Greene v. Fisher, — U.S. —, 132 S.Ct. 38, 45 (2011) (a Supreme Court decision issued three months after the last state court decision on the merits of a federal constitutional issue cannot be considered in determining clearly established federal law for § 2254(d)(1) purposes); Cullen v. Pinholster, 131 S.Ct. 1388, 1399 (2011) ("State-court decisions are measured against [the Supreme] Court's precedents as of the time the

34

state court renders its decision.") (quotation marks omitted); Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172 (2003) (explaining that "clearly established Federal law under § 2254(d)(1)" is measured "at the time the state court renders its decision") (quotation marks omitted).

Second, Evans also relies on some decisions of this Court to support his position on this issue. But a federal court of appeals decision favorable to a habeas petitioner cannot clearly establish that a state court decision of a federal constitutional issue is contrary to or an unreasonable application of federal law under § 2254(d)(1). See Parker v. Matthews, 132 S.Ct. 2148, 2155 (2012) ("The Sixth Circuit also erred by consulting its own precedents, rather than those of this Court, in assessing the reasonableness of the Kentucky Supreme Court's decision. . . . As we explained in correcting an identical error by the Sixth Circuit two Terms ago, circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA.") (citation omitted); Carey v. Musladin, 549 U.S. 70, 77, 127 S.Ct. 649, 654 (2006) ("Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court unreasonably applied clearly established Federal law.") (quotation marks and

35

alterations omitted); Dombrowski v. Mingo, 543 F.3d 1270, 1274 (11th Cir. 2008) ("We have held that the 'clearly established law' requirement of § 2254(d)(1) does not include the law of the lower federal courts."); Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) ("Our inquiry into what is clearly established federal law for AEDPA purposes must focus on the decisions of the Supreme Court. Clearly established federal law is not the case law of the lower federal courts, including this Court.") (quotation marks omitted);  Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (same).[11]

Third, the obstacles that a habeas petitioner faces under § 2254(d)(1) are daunting.  Bobby v. Dixon, — U.S. —, 132 S.Ct. 26, 27 (2011) ("Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was

---

[11]On the other hand, our decisions that are unfavorable to a habeas petitioner can defeat his claim under § 2254(d)(1).  If we have rejected a materially identical claim in a published opinion, that means it is the law of the circuit that the claim has no merit, and if the claim has no merit a state court's rejection of it cannot be "contrary to, or involv[e] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1). Otherwise, we would not have rejected the claim ourselves.  This Court sitting en banc or the Supreme Court can, of course, overrule our decisions but until that happens we are bound to follow our own published decisions to the extent that they are inconsistent with a habeas petitioner's claim that a contrary position is "clearly established Federal law" within the meaning of § 2254(d)(1).

an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.") (quotation marks omitted); Cullen v. Pinholster, 131 S.Ct. 1388, 1411 (2011) ("We have said time and again that an unreasonable application of federal law is different from an incorrect application of federal law.") (quotation marks omitted); Schriro v. Landrigan, 550 U.S. 465, 473–74, 127 S.Ct. 1933, 1939–40 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 785–86 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.") (quotation marks omitted); Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011) (en banc) ("Under AEDPA, our review of a final state habeas decision is greatly circumscribed and is highly deferential to the state courts.") (quotation marks omitted); Johnson v. Sec'y, Dep't of Corr., 643 F.3d 907, 910 (11th Cir. 2011) ("Stated the other way, only if there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents may relief be granted.") (quotation marks and alteration omitted). Evans' closure claim does not clear these high hurdles.

37

IV.

Evans' final contention is that his counsel rendered ineffective assistance of counsel by failing to call seven potential witnesses at the guilt stage of the trial. The Florida Supreme Court rejected this claim on performance grounds without reaching the prejudice issue. Evans, 995 So. 2d at 943–45. That court explained in detail why not calling each of the potential witnesses did not amount to constitutionally deficient performance under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984).[12] Id. The district court denied relief on this claim,

[12]The Florida Supreme Court concluded that Evans' counsel made a strategic decision on this point, and it explained:

In sum, counsel clearly made an informed decision about not presenting any witnesses during the guilt phase, which is exactly what he told the judge at the guilt phase: "After a year-and-a-half of consultation, followed by the last few minutes here, we're going to rest. . . ." Because the trial court's findings are supported by competent substantial evidence and counsel's decision not to present these witnesses was reasonable, we affirm the trial court's denial. Because counsel's failure to present these witnesses was not deficient, we do not address the prejudice prong of Strickland.

Evans, 995 So. 2d at 945 (footnote omitted). The court also noted:

Counsel also testified that he did not believe that any of these witnesses, who had credibility or other problems associated with their testimony, was worth giving up the "sandwich," i.e., losing the opportunity to give two closing arguments at the guilt phase. See Van Poyck v. State, 694 So. 2d 686, 697 (Fla. 1997) (concluding that there were tactical reasons for limiting the presentation of evidence

38

concluding that the Florida Supreme Court's rejection of the claim on performance

grounds as to six of the seven witnesses was not contrary to or an unreasonable

application of federal law under § 2254(d)(1).  Doc. 21 at 17–21.  Its conclusion is

correct.  As we have explained:

> Even without the deference due under § 2254, the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984), standard for judging the performance of counsel "is a most deferential one." Harrington, —  U.S. at —, 131 S.Ct. at 788. When combined with the extra layer of deference that § 2254 provides, the result is double deference and the question becomes whether "there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id., 131 S.Ct. at 788.  Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.

---

> that might indicate another person was the triggerman, such as losing the opportunity to give two closing arguments at the guilt phase); accord Reed, 875 So. 2d at 430.  The Legislature has since enacted section 918.19, Florida Statutes (2007), which provides that the State shall have opening and rebuttal closing arguments.  In addition, this Court amended Florida Rule of Criminal Procedure 3.250 and adopted Florida Rule of Criminal Procedure 3.381, confirming that the State is entitled to opening and rebuttal closing arguments even if the defense presents no evidence at trial.  In re Amendments to the Florida Rules of Criminal Procedure-Final Arguments, 957 So. 2d 1164, 1166-67 (Fla. 2007).  However, when Evans was prosecuted in 1999, the defense was permitted to have both the opening and rebuttal closing arguments if it presented no evidence; thus, counsel's decision to take this into consideration was reasonable at that time.

Id. at n.16.

Johnson, 643 F.3d at 910–11. We agree with the district court that this is not one of those rare cases.

In addition to the reasons the Florida Supreme Court gave for its decision and the reasons the district court gave for finding that decision to be reasonable as to six of the potential witnesses, we add the point that "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc); accord Cook v. Warden, 677 F.3d 1133, 1137 (11th Cir. 2012); Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 759 (11th Cir. 2010).

As to one of the seven potential witnesses, however, the district court stated that it "agree[d] with the ultimate conclusion of the state supreme court but disagree[d] with the rationale for how it concludes that Mr. Evans was provided effective assistance of counsel." Doc. 21 at 23–24. Applying what appears to be de novo review, the district court concluded that the Florida Supreme Court had erred in deciding that Evans had not met the performance prong of the Strickland test as to trial counsel not presenting the testimony of Mindy McCormick, but the district court denied relief anyway on the prejudice prong as to that witness. Id. at 26.

If, as it appears, the district court reviewed the part of the ineffective

40

assistance of counsel claim involving potential witness McCormick without any deference to the state court decision, it erred.  The Florida Supreme Court decided that Evans had failed to establish performance deficiency under Strickland as to all of the potential witnesses, including McCormick, and its decision was entitled to full AEDPA deference under § 2254(d)(1). The question is not how the district court or this Court would rule if presented with the issue for the first time and not whether we think the state court decision is correct, but whether its decision is contrary to or an unreasonable application of clearly established federal law. Bobby, 132 S.Ct. at 27; Cullen, 131 S.Ct. at 1410–11; Schriro, 550 U.S. at 473–74, 127 S.Ct. at 1939–40.  We need not decide that, however, because we agree with the district court that, for the reasons it stated, Evans has not established that he was prejudiced by his counsel's failure to call McCormick as a witness.

One of Evans' arguments is that the district court's analysis of the prejudice issue as to potential witness McCormick was flawed because the court did not consider any prejudice Evans suffered from the failure to call six other potential witnesses.  The prejudice inquiry, he insists, must be a cumulative one.  It is Evans' argument, not the district court's analysis, that is flawed.  While the prejudice inquiry should be a cumulative one as to the effect of all of the failures of counsel that meet the performance deficiency requirement, only the effect of counsel's

41

actions or inactions that do meet that deficiency requirement are considered in determining prejudice.  Strickland, 466 U.S. at 692, 104 S.Ct. at 2067 ("[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution"); id. at 694, 104 S.Ct. at 2068 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") (emphasis added).  Because Evans has failed to show any deficiency in counsel's performance based on not calling any of the other six witnesses, there is no deficiency to accumulate in order to establish prejudice.  Cf. Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012) ("[N]one of Morris's individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate.").  We reject Evans' cumulative prejudice argument.

We also reject Evans' argument that "the focus of a court's prejudice inquiry must be to try to find a constitutional violation, by engaging with the evidence and speculating as to its cumulative effect." Appellee/Cross-Appellant's Reply Br. at 13.  Our role is not to try and find a way to set aside state court judgments.  The Supreme Court has instructed us that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (quotation marks omitted).  And it has instructed us that "[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial," id. at 693, 104 S.Ct. at 2067.  And that "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors," id. at 696, 104 S.Ct. at 2069.  Instead of trying to find errors, "[w]e begin with the premise that under the circumstances, the challenged actions might be considered sound trial strategy." Cullen, 131 S.Ct. at 1404 (quotation marks and alteration omitted).  And if there were errors that amounted to deficient performance, to establish prejudice "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington, 131 S.Ct. at 792.  The presumption runs against the defendant, the burden is on him, and speculation about the merits of counsel's trial strategy is not enough to carry that burden.

## V.

The district court's judgment is affirmed insofar as it denied relief as to Evans' conviction but reversed insofar as it granted relief as to his sentence.

**AFFIRMED** in part and **REVERSED** in part.