[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13390
_____

D.C. Docket No. 0:17-cv-61921-RNS


RICHARD KNIGHT,

Petitioner-Appellant,

versus

FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 30, 2019)

Before TJOFLAT, JORDAN, and GRANT, Circuit Judges.

GRANT, Circuit Judge:

Richard Knight, a Florida prisoner sentenced to death for the murders of

Odessia Stephens and her daughter, Hanessia Mullings, appeals the district court's

denial of his federal habeas corpus petition. At this stage—almost 20 years after

the crimes were committed and more than a decade after a Florida jury found Knight guilty of the murders and recommended a death sentence—Knight's claims have been winnowed down to two: first, that his death sentence is invalid under *Hurst v. Florida*, 136 S. Ct. 616 (2016), and second, that he received ineffective assistance of counsel at trial.  Because *Hurst* does not apply retroactively to Knight, any challenge to his death sentence on that basis is beyond our reach on federal habeas review.  Nor can Knight find success in his other challenge; the Florida Supreme Court's rejection of his ineffective-assistance claim was not an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).  We therefore affirm.

## I.

### A.

According to evidence introduced at his murder trial, Knight lived in an apartment with his cousin, Hans Mullings, and Hans's girlfriend, Odessia.  Hans and Odessia's four-year-old daughter, Hanessia, also lived with them in the apartment.  Odessia was tired of supporting Knight and one evening while Hans was out she argued with Knight, insisting that he move out the next day.  After the argument got heated, Knight left the house to walk around.  But as he later confessed to another inmate, instead of getting less angry with Odessia once he got some air, Knight became increasingly irate.  He returned to the apartment and after exchanging more words with Odessia, he got a knife from the kitchen.  When he went back to the master bedroom, he found Odessia and her little girl in the bed. He began stabbing Odessia and continued his attack until she stopped resisting and

2

curled up on the bedroom floor.  He then moved on to little Hanessia, stabbing her until his knife broke and cutting his hand in the process.  As he was leaving the bedroom, he heard "popping noises" from where Hanessia lay on the floor, and he thought that the little girl was "drowning in her own blood."  Apparently not considering his revenge complete, he retrieved a second knife from the kitchen and returned to continue his attack on Odessia.  In the meantime, Odessia had crawled from the bedroom to the living room, where she had collapsed.  Knight turned her over, saw that she was still alive, and started stabbing her again.

Both Odessia and Hanessia died that night.  In total, Odessia had 21 stab wounds, including 14 in the neck, 24 puncture or scratch wounds, bruising and ligature marks consistent with having been hit and strangled with a belt, defensive wounds, and bruises from being hit or punched in the mouth and head.  Little Hanessia had four stab wounds in her upper body and neck, a deep defensive wound on her hand, bruises on her neck consistent with manual strangulation, and bruises on her arms consistent with having been grabbed.

Knight showered and changed after completing his brutal acts, then headed to the living room with a rag to wipe off the knives.  Interrupted by a knock on the front door—it was police responding to a neighbor's 911 call—Knight ran to his room and climbed out the window.

Shortly after they arrived, police encountered Knight near the apartment.  He told them that he lived there, but that he did not have a key.  This was odd; the officers had already found that all the doors to the apartment were locked.  Knight was also visibly wet—but it was not raining.  Knight explained to police that he

3

had been jogging, a remarkable contention from a person who was wearing long pants and dress shoes. He did not appear to be sweating, in any event. And Knight's personal appearance subsequently revealed even more clues—he had blood on the back of his shirt, scratches on his chest and midsection, a scrape on his shoulder, and fresh cuts on his hand.

Knight was arrested and indicted for two counts of first-degree murder. A Florida jury found him guilty as charged. That same jury heard evidence and argument at the penalty phase and unanimously recommended two death sentences—one for each murder. Consistent with Florida's then-current death penalty sentencing procedure, the judge held an additional hearing, made his own findings regarding aggravating and mitigating circumstances, and sentenced Knight to death. The Florida Supreme Court affirmed Knight's convictions and sentences on direct appeal. *Knight v. State*, 76 So. 3d 879, 890 (Fla. 2011). The United States Supreme Court denied his petition for certiorari. *Knight v. Florida*, 566 U.S. 998, 998 (2012).

## B.

Knight filed motions for state collateral relief raising the two claims at issue here, as well as others that have already been resolved. Specifically, he argued that the state court should vacate his death sentence in light of *Hurst v. Florida*, in which the Supreme Court held—four years after Knight's conviction was final— that Florida's death penalty sentencing scheme violated the Sixth Amendment. 136 S. Ct. at 622. The problem identified by the Supreme Court in *Hurst*, and argued by Knight in his post-conviction pleadings, was that the jury's role in

4

sentencing was to make a non-binding recommendation; the judge alone made the ultimate findings of fact necessary to impose the death penalty. *Id.* at 619, 621–22. Knight also argued that his guilt-phase counsel was constitutionally ineffective for failing to call an available DNA expert.

The Florida Supreme Court rejected his postconviction claims on the merits. *Knight v. State*, 225 So. 3d 661, 668 (Fla. 2017) (per curiam). A plurality of the court agreed with Knight that the sentencing procedure used in his case violated the Sixth Amendment under *Hurst*, but also concluded that the *Hurst* error was harmless. *Id.* at 682. The plurality explained that under the facts of Knight's case the penalty-phase jury had necessarily made the factual findings necessary to impose the death penalty—that "sufficient aggravators existed" and that "the aggravation outweighed the mitigation"—when it returned a unanimous vote recommending death.[1] *Id.* at 682–83 (citation omitted). As for his ineffective-assistance claim, the court held that Knight had failed to meet his burden under *Strickland* because he had not shown that his attorney's decision not to call his DNA expert constituted deficient performance, or that there was any reasonable probability that that decision negatively affected the outcome of his trial. *Id.* at 673–74.

---

[1] Three out of seven justices joined the opinion on Knight's *Hurst* claim. Two additional justices concurred in the result only. *Knight*, 225 So. 3d at 684.

C.

Knight filed a petition for federal habeas review in the Southern District of Florida, pursuant to 28 U.S.C. § 2254. The district court denied relief but granted a certificate of appealability on the two claims now before us.

II.

A.

Federal courts may grant habeas corpus relief to prisoners who are being detained "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(3); 2254(a). But our authority to award this kind of relief to state prisoners is limited—by both statute and Supreme Court precedent.

*First*, the Antiterrorism and Effective Death Penalty Act (AEDPA) limits our authority to award habeas relief. A federal court may not grant a state prisoner's habeas petition on any issue that was decided on the merits by the state court unless the state court's ruling "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). And as the Supreme Court has explained, "clearly established" federal law means "the holdings, as opposed to the dicta" from its controlling precedents at the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

6

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A state court decision involves an unreasonable application of federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* To justify issuance of the writ under the "unreasonable application" clause, the state court's application of Supreme Court precedent must be more than just wrong in the eyes of the federal court; it "must be 'objectively unreasonable.'" *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (quoting *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002) (explaining that "an unreasonable application is different from an incorrect one.").

*Second*, Supreme Court precedent demands that in any federal habeas proceeding—including collateral proceedings in capital cases—where the petitioner seeks the benefit of a "new" rule of constitutional law, we must first determine whether the rule actually qualifies as new, and then whether that rule applies retroactively to the case. *See Teague v. Lane*, 489 U.S. 288, 300–01 (1989) (plurality opinion); *Penry v. Lynaugh*, 492 U.S. 302, 313–14 (1989) (stating that the retroactivity approach from *Teague* applies in capital cases), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 312–16, 321 (2002). In most cases, we cannot disturb a state conviction based on a constitutional rule

announced after a conviction became final. *Teague*, 489 U.S. at 310. Only two narrow exceptions pierce this general principle of nonretroactivity: new rules that are "substantive rather than procedural," and "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Schriro v. Summerlin*, 542 U.S. 348, 352–53 (2004) (internal quotation marks and citations omitted). In all other cases the rule applies only prospectively.

What this means in plain English is that, in the vast majority of cases, prisoners will not be able to secure federal habeas relief based on a new constitutional rule—even when that rule runs in their favor. "This is but a recognition that the purpose of federal habeas corpus is to ensure that state convictions comply with the federal law in existence at the time the conviction became final, and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine." *Sawyer v. Smith*, 497 U.S. 227, 234 (1990).

Though these two constraints—the rule of nonretroactivity set out in *Teague* and the deference to state court decisions mandated by AEDPA—are similar in some respects, they are nonetheless "quite separate" in their operation, and a state prisoner seeking federal habeas relief must clear both hurdles to succeed. *Greene v. Fisher*, 565 U.S. 34, 39 (2011). Accordingly—and the Supreme Court has made this clear—"in addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold *Teague* analysis when

8

the issue is properly raised by the state." *Horn v. Banks* (*Banks I*), 536 U.S. 266, 272 (2002) (per curiam).

## B.

Before conducting that analysis here, we pause to explain why we cannot simply accept the Florida Supreme Court's decision to apply *Hurst* retroactively to Knight and review only its harmless-error analysis, as Knight urges us to do. Because the Florida Supreme Court had already decided to give him the benefit of *Hurst*, Knight says, the *Teague* retroactivity analysis no longer has any bearing in his case. He is wrong. While states may fashion their own retroactivity doctrines as a matter of state law, those doctrines cannot displace *Teague* on the federal stage. Our ability to consider whether Florida applied *Hurst* correctly depends entirely on whether we can apply *Hurst* ourselves. So far, neither the Supreme Court nor this Circuit has answered that question by analyzing *Hurst*'s retroactivity under *Teague*.[2]

Florida, on the other hand, has its own retroactivity standard—and is free to give broader retroactive effect to new constitutional rules in state court proceedings

---

[2] We have noted in passing that *Hurst* would not apply retroactively to a petitioner whose convictions became final long before the Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002), on which *Hurst* relied, and even before *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which formed the basis for *Ring*. *See Lambrix v. Sec'y, Fla. Dep't of Corr.*, 851 F.3d 1158, 1165 n.2 (11th Cir. 2017). And we have concluded in the context of an improvidently granted certificate of appealability that the Florida Supreme Court's decision not to apply *Hurst* retroactively to the same petitioner as a matter of state law was not contrary to or an unreasonable application of existing Supreme Court precedents. *See Lambrix v. Sec'y, Dep't of Corr.*, 872 F.3d 1170, 1182 (11th Cir. 2017) (per curiam). But the question of *Hurst*'s retroactivity under *Teague* to a petitioner like Knight—whose convictions became final after *Ring* but before *Hurst*—was not squarely presented in either case, so we did not conduct that analysis.

than *Teague* allows in federal cases. *See Danforth v. Minnesota*, 552 U.S. 264, 282 (2008). That is because the *Teague* bar "was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own State's convictions." *Id.* at 280–81. So when states choose to apply new rules of constitutional procedure that are not retroactive under *Teague* in federal courts, they "do not do so by misconstruing the federal *Teague* standard. Rather, they have developed *state* law to govern retroactivity in state postconviction proceedings." *Id.* at 288–89 (emphasis in original).

In deciding to apply *Hurst* retroactively to certain state habeas cases, the Florida Supreme Court did just that. *See Mosley v. State*, 209 So. 3d 1248, 1274–83 (Fla. 2016) (per curiam). Florida's retroactivity doctrine is unique to Florida—it applies to a limited class of constitutional decisions that announce changes "of fundamental significance," which for procedural rules requires consideration of three factors: "(a) the purpose to be served by the rule, (b) the extent of reliance on the prior rule, and (c) the effect that retroactive application of the new rule would have on the administration of justice." *Asay v. State*, 210 So. 3d 1, 16–17 (Fla. 2016) (per curiam) (citation omitted). For new constitutional rules involving the death penalty, Florida courts also consider on a case-by-case basis whether fundamental fairness requires retroactive application of the rule. *Mosley*, 209 So. 3d at 1274 (citing *James v. State*, 615 So. 2d 668, 668 (Fla. 1993)).[3] If that sounds

---

[3] The Florida Supreme Court is now considering whether it should recede from the retroactivity analysis employed in *Asay*, *Mosley*, and *James*. *See Owen v. State*, No. SC18-810, April 24,

broader than *Teague*, it is for good reason—the Florida Supreme Court has itself acknowledged that this retroactivity standard is "more expansive" than the federal rule. *Johnson v. State*, 904 So. 2d 400, 409 (Fla. 2005) (per curiam), *abrogated on unrelated grounds by Asay*, 210 So. 3d at 15–16.

All that to say, Florida may make its own choice about the retroactivity of a given case as a matter of state law. And for *Hurst*, it has done so. Using its own standard, the Florida Supreme Court decided that *Hurst* would apply retroactively in state collateral review proceedings for petitioners whose convictions had not yet become final when the U.S. Supreme Court decided *Ring v. Arizona*; *Ring* held in 2002 that the Sixth Amendment requires a jury (rather than a judge) to find the aggravating factors necessary to impose the death penalty. *See Mosley*, 209 So. 3d at 1283 (citing *Ring v. Arizona*, 536 U.S. 584 (2002)). The Florida Supreme Court reasoned that because *Hurst* struck down Florida's capital sentencing scheme based on *Ring*, prisoners whose cases were still pending on direct appeal when *Ring* was decided "should not suffer due to the United States Supreme Court's fourteen-year delay in applying *Ring* to Florida." *Id.* Following that rule, because Knight's conviction became final ten years after *Ring* was decided, the Florida Supreme Court applied *Hurst* retroactively in his postconviction proceeding. *Knight*, 225 So. 3d at 682.

2019 order (directing parties to brief the issue). The uncertain fate of Florida's current retroactivity doctrine offers another reason that we cannot simply rely on a state retroactivity decision as a basis for federal habeas relief. If the state doctrine were to change during our review, would we then be faced with the question of whether to apply the state's new retroactivity doctrine—retroactively?

But that state-law retroactivity determination has no significance in federal court.  Unlike state courts, lower federal courts are not free to create our own rules of retroactivity—if the government raises the issue, a *Teague* analysis is mandatory.  *Banks I*, 536 U.S. at 271–72.  As we have said, "States may exercise their collateral review power without regard to the *Teague* doctrine.  Their doing so has no effect on later federal review."  *Glock v. Singletary*, 65 F.3d 878, 890–91 (11th Cir. 1995) (en banc).  So we are bound to follow *Teague*'s retroactivity principles whether or not the state court chose to apply the new rule in its own collateral proceeding.  *See, e.g., Banks I*, 536 U.S. at 271–72.

Here, then, we must conduct our own retroactivity analysis, using the standards articulated in *Teague*.  And to repeat: *Teague* retroactivity is a "threshold question in every habeas case."  *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994).  When "issues of both retroactivity and application of constitutional doctrine are raised," we must decide the retroactivity issue first.  *Bowen v. United States*, 422 U.S. 916, 920 (1975).  Where the State raises the issue, therefore, "federal habeas corpus courts *must* apply *Teague* before considering the merits" of the petitioner's claims.  *Beard v. Banks* (*Banks II*), 542 U.S. 406, 412 (2004) (emphasis in original) (internal quotation marks and citation omitted).

What's more, if a constitutional claim is *Teague*-barred, we do not reach its merits.  *See, e.g.*, *id.* at 410 n.2.  That is because the Supreme Court's "jurisprudence concerning the 'retroactivity' of 'new rules' of constitutional law is primarily concerned, not with the question whether a constitutional violation occurred, but with the availability or nonavailability of remedies."  *Danforth*, 552

12

U.S. at 290–91.  If the holding relied on qualifies as a new rule and does not meet *Teague*'s strict requirements for retroactivity, then the claim is not redressable here—the "nonretroactivity principle *prevents* a federal court from granting habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final."  *Caspari*, 510 U.S. at 389 (emphasis in original).  And as we have said before, if "the court cannot relieve the harm of which a plaintiff complains, the court should not take the case; in the absence of an effective remedy its decision can amount to nothing more than an advisory opinion."  *Wymbs v. Republican State Exec. Comm.*, 719 F.2d 1072, 1085 (11th Cir. 1983).

Our authority to overturn state convictions is limited, and the retroactivity principles articulated in *Teague* are tailored to those limitations.  *See Danforth*, 552 U.S. at 277.  The fact that state courts do not face the same constraints on collateral review of their *own* criminal proceedings as we do does not relieve us of the obligation to apply federal retroactivity standards.  *See id.* at 280–81; *Banks I*, 536 U.S. at 271.  In fact, our narrow authority as federal courts to disrupt final state-court convictions reflects our recognition of the states' own sovereignty.  So Florida may design and apply its retroactivity principles as generously as it wishes.  But notwithstanding Florida's decision to apply *Hurst*—or any future decision— retroactively as a matter of state law, as a federal court we are required to perform the *Teague* analysis to determine whether prisoners can receive retroactive relief under federal law.

In sum, if *Hurst* announced a new rule of constitutional law, but one that does not fall into one of the exceptions to *Teague*'s bar on retroactivity, Knight

13

cannot obtain federal habeas relief for any *Hurst* error in his sentence—regardless of what Florida may choose to do under state law. And if Knight cannot obtain federal habeas relief for his *Hurst* claim in any event, we may not offer an advisory opinion on whether the claim could have merit.

## III.

### A.

Turning to *Teague*, our analysis has three steps. *First*, we determine the date when the petitioner's conviction became final. *Banks II*, 542 U.S. at 411. This happens when the United States Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003). Here, the Court denied Knight's petition for a writ of certiorari on May 14, 2012—more than three years before *Hurst* was decided. *Knight*, 566 U.S. at 998.

*Second*, if the rule that the petitioner wants to apply had not been announced by that final-conviction date, we "assay the legal landscape" as it existed at the time and determine whether existing precedent compelled the rule—that is, whether the case announced a new rule or applied an old one. *Banks II*, 542 U.S. at 413. If—and only if—the holding was "*dictated* by precedent existing at the time the defendant's conviction became final," then the rule is not new and may be applied retroactively on federal habeas review (indeed, it must be). *Caspari*, 510 U.S. at 390 (emphasis in original) (quoting *Teague*, 489 U.S. at 301). And that is not a light test—a rule is not dictated by prior precedent "unless it would have been 'apparent to all reasonable jurists.'" *Chaidez v. United States*, 568 U.S. 342, 347

14

(2013) (quoting *Lambrix v. Singletary*, 520 U.S. 518, 528 (1997)).  The fact that a decision is "within the logical compass of" or even "controlled by" prior precedent is not conclusive in the *Teague* analysis.  *Butler v. McKellar*, 494 U.S. 407, 415 (1990) (internal quotation marks and citation omitted).  To "'dictate' a result, prior precedent must be specific; it is not enough that it name the general principle from which the assertedly new rule sprang."  *Glock*, 65 F.3d at 884.

Knight argues that *Ring v. Arizona* dictated the rule in *Hurst*.  In *Ring*, the Supreme Court held that Arizona's capital sentencing scheme, which required judges alone to hear penalty-phase evidence and make factual findings relevant to the imposition of the death penalty, violated the defendant's Sixth Amendment right to a jury trial.  536 U.S. at 588–89.  In doing so, the Court explicitly overruled its precedent upholding Arizona's death penalty sentencing scheme, "to the extent that it allows a sentencing judge, *sitting without a jury*, to find an aggravating circumstance necessary for imposition of the death penalty."  *Id.* at 609 (emphasis added) (overruling *Walton v. Arizona*, 497 U.S. 639, 647–49 (1990)).

Knight wants us to find that the new *Hurst* rule is actually the old *Ring* rule for an obvious reason—if the rule is not new, and instead was binding on lower courts at the time of Knight's conviction, then he is entitled to the benefit of the rule on federal habeas review.  *See Yates v. Aiken*, 484 U.S. 211, 216–17 & n.3 (1988).  But *Ring* did not dictate the Supreme Court's later invalidation of Florida's death penalty sentencing scheme in *Hurst*.  In fact, the *Ring* Court specifically acknowledged that Florida's capital sentencing procedure differed

from the Arizona scheme that it rejected. *See Ring*, 536 U.S. at 607–08 & n.6 (categorizing state capital sentencing schemes according to jury involvement in sentencing). In Arizona, the judge alone made the factual findings necessary to impose the death penalty and imposed that penalty entirely apart from the jury. *See id.* at 588. Florida's scheme, in contrast, incorporated an advisory jury that considered penalty-phase evidence and recommended a sentence of life or death to the court. Only after the jury's recommendation did the judge impose a sentence. *See id.* at 608 n.6; Fla. Stat. Ann. § 921.141 (2001).

*Hurst*'s conclusion that Florida's "hybrid" death penalty sentencing system violated the Sixth Amendment was not "apparent to all reasonable jurists" when Knight's convictions became final in 2012. We venture to count ourselves and our colleagues on this Court as members of that distinguished group. And in *Evans v. Secretary, Florida Department of Corrections*, we held that *Ring* did not invalidate Florida's capital sentencing scheme. 699 F.3d 1249, 1264–65 (11th Cir. 2012). We found it significant that Florida's statute—unlike the Arizona law at issue in *Ring*—required the penalty phase jury to find that sufficient aggravating circumstances existed before it could recommend a death sentence, and directed the sentencing court to give "great weight" to the jury's advisory verdict. *Id.* at 1261 (citation omitted). We also noted that the Supreme Court had taken obvious pains in *Ring* to distinguish hybrid systems like Florida's from the "judge-only" sentencing scheme in Arizona and concluded that such distinctions would not have been necessary if the Court had intended to strike down both systems. *Id.* at 1262.

16

And we were not the only ones.  In fact, Justice Alito wrote along those same lines in his dissenting opinion in *Hurst*:  "Although the Court suggests that today's holding follows ineluctably from *Ring*, the Arizona sentencing scheme at issue in that case was much different from the Florida procedure now before us." 136 S. Ct. at 625 (Alito, J., dissenting).  After describing the "critically important role" of the advisory jury in Florida's death penalty sentencing scheme, Justice Alito concluded that the "decision in *Ring* did not decide whether this procedure violates the Sixth Amendment, and I would not extend *Ring* to cover the Florida system." *Id.* at 626.  Clearly, reasonable jurists could—and did—disagree that *Ring* compelled the outcome in *Hurst*.  The Alito dissent and this Court's pre-*Hurst* holding strongly indicate that *Hurst* announced a new constitutional rule rather than applying an old one.  *See Banks II*, 542 U.S. at 415.

That conclusion is only strengthened by the fact that *Ring* did not specifically address the continued validity of the Supreme Court's precedents *upholding* Florida's death-penalty sentencing system—*Spaziano v. Florida*, 468 U.S. 447 (1984), and *Hildwin v. Florida*, 490 U.S. 638 (1989) (per curiam).  And the Court has repeatedly instructed us to follow its precedents, even if later decisions appear to undermine them, unless and until the Court itself sets them aside.  *See, e.g., Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." (citation omitted)); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).  So *Spaziano* and *Hildwin* remained good law until the Court

17

explicitly overruled them in *Hurst*. *See Saffle v. Parks*, 494 U.S. 484, 488 (1990) (explaining that the "explicit overruling of an earlier holding no doubt creates a new rule"); *see also Hurst*, 136 S. Ct. at 623. It is hard to imagine that the Supreme Court overruled those cases in *Ring* but forgot to say so until *Hurst*.

Because all these factors show that *Hurst* was not dictated by prior precedent—and in fact explicitly overruled existing precedent upholding Florida's death penalty sentencing scheme—we can see that the rule in *Hurst*, which led to a conclusion that the Florida scheme was unconstitutional, was new.

Having determined that *Hurst* announced a new rule of constitutional law, we proceed to the final step in the *Teague* analysis—whether *Hurst* "falls within either of the two exceptions to nonretroactivity." *Banks II*, 542 U.S. at 411. Those exceptions, again, include (1) holdings that create substantive (not procedural) rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," and (2) holdings that constitute "watershed rules of criminal procedure." *Teague*, 489 U.S. at 311–13 (citation omitted).

The *Hurst* rule does not fit within either exception. To begin, substantive rules include decisions that change "the range of conduct or the class of persons that the law punishes." *Schriro*, 542 U.S. at 353. Procedural rules, on the other hand, "regulate only the *manner of determining* the defendant's culpability." *Id.* (emphasis in original). In considering which category the *Hurst* rule falls into, we have a head start because the Supreme Court has already held that *Ring* represented a "prototypical procedural rule[]." *Id.* And that makes sense: *Ring* changed the

18

permissible *procedure* for sentencing in a capital case when it required "that a jury rather than a judge find the essential facts" necessary to impose the death penalty. *See id.* Because *Hurst*'s holding—that an advisory "jury's mere recommendation is not enough" to satisfy this procedural requirement—is an extension of the rule from *Ring*, we have no trouble concluding that *Hurst* also announced a procedural rule, and not a substantive one. *Hurst*, 136 S. Ct. at 619.

The second exception is for "watershed rules of criminal procedure." *Banks II*, 542 U.S. at 417. This exception is extremely limited in scope—it applies "only to a small core of rules" so fundamental to our criminal process that it is "unlikely that many such components of basic due process have yet to emerge." *Id.* (citations omitted). Indeed, the watershed exception remains somewhat theoretical at this point; in the years following *Teague*, the Supreme Court has never found a rule that fits. *See id.* And in "providing guidance as to what might fall within this exception," the Court has "repeatedly referred to the rule of *Gideon v. Wainwright*, 372 U. S. 335 (1963) (right to counsel), and only to this rule." *Id.* Knight does not contend that *Hurst* announced a new watershed rule that compares to *Gideon*, and we do not see how it could have either. In short, *Hurst* meets neither exception, and therefore is not retroactive.

## B.

Because the *Hurst* rule is not retroactive, Knight cannot receive federal habeas relief on his *Hurst* claim. That is as it must be—we are conscientious about the fact that "*Teague*'s nonretroactivity principle acts as a limitation on the power of federal courts to grant habeas corpus relief." *Id.* at 412 (internal quotation

19

marks and citation omitted).  And because we would have no lawful remedy to offer even if we could identify an error, we must decline to consider whether any *Hurst* error exists.  That means, of course, that we also do not consider whether the un-found and un-remediable error could be harmless.

Knight disputes this path.  He argues that, even conceding the lack of an available remedy for any *Hurst* error, whether that un-remediable error was harmless is itself a separate question of federal law under *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993).  He thus urges us to review the state court's harmless-error analysis, regardless of whether we reach the merits of his *Hurst* claim.  We will not.  It strains the imagination—as well as our constitutional and institutional respect for state courts—to suppose that we *cannot* remedy an error, but that we *can* somehow remedy an erroneous state-court conclusion that the error was harmless.

And *Brecht* does not stand for the proposition that Knight asserts in any event.  While *Brecht* established the harmless-error standard for collateral review of constitutional trial errors, it did not create a stand-alone federal claim severable from the question of whether remediable error existed in the first place.[4]  *See Williams v. Singletary*, 114 F.3d 177, 180 (11th Cir. 1997) (per curiam), *as amended on denial of reh'g* (July 29, 1997).  Some underlying violation of federal law that we can address is a necessary predicate to federal habeas relief—unless

---

[4] As an aside, what *Brecht* really decided was that federal courts evaluating constitutional trial error on collateral review would apply a more relaxed harmless-error standard—whether the error "had substantial and injurious effect or influence in determining the jury's verdict"—rather than the harmless-beyond-a-reasonable-doubt standard used on direct review.  *Brecht*, 507 U.S. at 638 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

we agree that an error has occurred, it makes no difference whether the purported error was harmless. "We have consistently applied the *Brecht* harmless error standard only after determining that there was an error." *Id.*; *cf. Wilson v. Corcoran*, 562 U.S. 1, 6 (2010) (per curiam) ("It is not enough to note that a habeas petitioner *asserts* the existence of a constitutional violation; unless the federal court agrees with that assertion, it may not grant relief." (emphasis in original)). There is no free-floating federal constitutional right to infallible application of harmless-error principles.

And again, where our retroactivity doctrine forecloses the possibility of federal habeas relief for a constitutional error, we are constrained to stop looking. *See Bowen*, 422 U.S. at 920. The Supreme Court "consistently has declined to address unsettled questions regarding the scope of decisions establishing new constitutional doctrine in cases in which it holds those decisions nonretroactive," and has instructed us to do the same. *Id.* at 920–21. This directive carries constitutional weight; as an Article III court, we are "without power to decide questions that cannot affect the rights of litigants in the case" at hand. *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam). So even if we found *Hurst* error in Knight's sentencing, we would still be prohibited from issuing a writ of habeas corpus on that ground because *Hurst* is not retroactively applicable to Knight under *Teague*. After all, *Teague*'s nonretroactivity command is a limitation on our power, not a polite suggestion. *Banks II*, 542 U.S. at 412. So our opinion— whatever it might be—on Knight's *Hurst* claim would be purely advisory. "And it is quite clear that the oldest and most consistent thread in the federal law of

21

justiciability is that the federal courts will not give advisory opinions." *Flast v. Cohen*, 392 U.S. 83, 96 (1968) (internal quotation marks and citation omitted).

Where, as here, *Teague* bars relief before we reach the preliminary question of whether constitutional error occurred at all, consideration of the secondary question of whether any such error was harmless would be a prohibited and pointless exercise for both the petitioner and this Court. We therefore cannot grant Knight relief on his *Hurst* claim, whether or not it is cloaked in the garb of harmless error.

## IV.

We now turn to Knight's other claim. The State presented extensive DNA evidence against him during the guilt phase of his trial. Kevin Noppinger, a serologist with the Broward County Sheriff's Office crime lab, testified that Knight had Odessia's blood on his hand and her DNA on his shirt when he was arrested. Fingernail scrapings from Odessia's body showed that she, in turn, had Knight's DNA under her fingernails. Noppinger also tested samples from the bloody clothes (boxer shorts, a shirt, and jean shorts) found under the bathroom sink. He found Knight's blood mixed with Hanessia's blood on the boxer shorts, Odessia's and Hanessia's blood elsewhere on the boxer shorts and on the jean shorts, and Odessia's blood on the shirt.

One of the State's other experts was Kevin McElfresh of Bode Technology Group, whose DNA analysts had conducted additional testing on different samples from the same items of clothing. In particular, McElfresh's group analyzed DNA samples from an unstained area of the waistband of the boxer shorts in an attempt

22

to determine who owned them.   Although Bode's initial report stated that Knight's DNA was not on the waistband sample, McElfresh testified at trial that he had conducted some additional analysis and determined that some of the DNA on the waistband *could* have been Knight's.

Knight's guilt-phase counsel consulted with DNA expert Dr. Norah Rudin, who was listed as a potential trial witness by the defense.  Dr. Rudin informed counsel that, although some of Noppinger's sample labeling practices were sloppy, she generally agreed with his conclusions about the sources of the DNA samples he analyzed.  She was much more critical of McElfresh's analysis: she called his methods "fundamentally incorrect and inherently biased" and his testimony "incomplete and misleading."  In her opinion, the DNA test results for the waistband samples were "inconclusive."  But Dr. Rudin did not stop there—she also considered McElfresh's testimony "relatively inconsequential when viewed in the context of the biological evidence as a whole."  She told Knight's counsel that she did not believe that she could help his case, and that she would not call herself as an expert if she were in his shoes.  Counsel, it appears, agreed with her perspective and did not call her at trial.

Testimony indicates that one additional fact persuaded counsel that calling Dr. Rubin to quibble with McElfresh's methods would not be good trial strategy. At the time of Knight's trial, Florida permitted a defendant who did not put up any evidence at trial to give both initial and rebuttal closing arguments—an advantage ordinarily offered to the prosecution.  Dr. Rudin would have been Knight's only witness, so calling her to testify would have meant giving up the opportunity to

23

have the first word and the last at closing. Given that fact, she would have largely corroborated Noppinger's testimony while also costing Knight an advantage at closing arguments.

Nonetheless, on state collateral review, Knight contended that his counsel provided constitutionally ineffective assistance by failing to call Dr. Rudin as an expert. He argued that Dr. Rudin's criticisms of McElfresh's methods and the crime lab's labeling practices would have cast doubt on all of the State's DNA evidence and significantly damaged the State's case. The Florida Supreme Court disagreed, finding that Knight had not met his burden on either prong of the two-part test for ineffective assistance of counsel claims set out in *Strickland*. *See Knight*, 225 So. 3d at 672–74. Knight, however, argues that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

To begin, the Florida Supreme Court correctly identified the governing standard. *Strickland* is the relevant "clearly established" Supreme Court precedent for purposes of an ineffective-assistance claim. *See Premo v. Moore*, 562 U.S. 115, 118 (2011). Under *Strickland*, to succeed on a claim of ineffective assistance of counsel, a defendant must show both that his attorney's performance was deficient—that is, "that counsel's representation fell below an objective standard of reasonableness"—and that he was prejudiced by the inadequate performance. *Strickland*, 466 U.S. at 687–88. In applying the first prong, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of

24

reasonable professional assistance." *Id.* at 689. And to show prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The *Strickland* standard is "highly deferential," as is the review of a state-court decision under AEDPA; "when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations omitted). In reviewing a state court's application of *Strickland*, therefore, a federal habeas court cannot conduct a de novo review and reverse simply because it strongly disagrees with the state court's conclusion. *Id.* at 102. Instead, for Knight to succeed on his ineffective-assistance claim, we must conclude that the Florida Supreme Court's decision "was an objectively unreasonable application of the *Strickland* standard." *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 751 (11th Cir. 2010).

The Florida Supreme Court determined that counsel's decision not to call Dr. Rudin at trial was reasonable trial strategy. *Knight*, 225 So. 3d at 674. Whether the decision was actually a matter of strategy is a question of fact; thus, the state court's finding on that issue is presumed to be correct. *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998). We must accept all factual findings made by the state court unless the petitioner rebuts the presumption of correctness "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Wood v. Allen*, 542 F.3d 1281, 1285 (11th Cir. 2008). Knight has not presented

25

any evidence to suggest that counsel's decision was anything other than a matter of strategy, and we accept the state court's finding on that point.

Whether counsel's strategic decision not to call Dr. Rudin was reasonable is a question of law, which we review through the lens of AEDPA deference. *See Ferrell v. Hall*, 640 F.3d 1199, 1223–24 (11th Cir. 2011). In assessing an attorney's performance under *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc). We have no reason to doubt the Florida Supreme Court's conclusion that counsel's decision not to call an equivocal expert, in part to preserve an advantage at closing, was well within the wide range of reasonably competent performance.

The Florida Supreme Court also determined that Knight had not met his burden of showing prejudice under *Strickland* because there was no reasonable probability that Dr. Rudin's testimony would have made a difference in the outcome of the trial, given the weight of the evidence against him. *See Knight*, 225 So. 3d at 674. That conclusion was also reasonable.

Dr. Rudin generally agreed with Noppinger's conclusions regarding the DNA evidence. With or without Dr. Rudin's testimony, therefore, there was no dispute that Knight had Odessia's blood on his hand and her DNA on his shirt when he was arrested, or that Knight's DNA was found under Odessia's

26

fingernails. Knight's blood—as well as Odessia's blood and Hanessia's—was on the clothes discarded at the crime scene. And even if the jury had heard Dr. Rudin's criticism of McElfresh's testimony that Knight could not be ruled out as a DNA contributor for the waistband of the boxer shorts, other evidence showed that the clothes were his: the boxer shorts were the same brand and size as the ones that Knight was wearing when he was arrested, and Knight's cousin testified that the bloody shirt was one that Knight wore often.

And the evidence did not stop there. Knight was known to be home with Hanessia less than an hour before the murders, and the jury heard evidence of ongoing tension with Odessia. Police found him near the scene of the murders shortly after they arrived, and his answers to their questions were inconsistent with his appearance. All of that is in addition to the testimony of an inmate housed with Knight at the Broward County jail, who testified that Knight confessed the crime to him, providing a detailed description of events and a floorplan of the apartment. In short, even if the jury had entirely discounted McElfresh's testimony as a result of Dr. Rudin's criticism of his testing methods, the remaining evidence against Knight was so strong that the chance of a not-guilty verdict still would have been remote, to say the least.

The Florida Supreme Court's conclusion that Knight failed to make the required showings of deficient performance and prejudice was not an unreasonable application of *Strickland*.

27

\* \* \*

In sum, we are prohibited from considering Knight's *Hurst* claim by *Teague*'s rule of nonretroactivity, which eliminates any possibility of relief regardless of whether there was an error and regardless of whether any error was harmless. And our review of Knight's ineffective-assistance claim shows that the state court's ruling on that issue was not an unreasonable application of governing Supreme Court precedent. We therefore affirm the district court's denial of Knight's federal habeas petition.

**AFFIRMED.**

28